## Southern Railway Co., et al. v. Stewart.

(Decided December 14, 1910.)

### Appeal from Whitley Circuit Court.

1. Dynamite—Unguarded—Explosion in Railroad Yard.—Negligence of Railroad Company.—On the trial of the Southern Railway Co. and the L. & N. R. R. Co., who were jointly sued by appellee for damages to his house caused by the alleged negligence of the appellants in causing the explosion of 450 cases of nitro-glycerine placed in the railroad yards at Jellico, Ky., and not guarded, and no warning given to the public that the car contained explosives, (the said yards being in the joint control of the appellant railroad companies) the jury returned a verdict in favor of the plaintiff, appellee, for $1,600. There was evidence to the effect that within about 20 feet of where the car stood, there was a common shooting ground where persons shot at marks and turkeys for amusement, and this fact was known to appellant. On the trial it was appellee's contention that the explosion was

caused by the shunting of other cars against the car loaded with dynamite.

2. Trial—Errors—Incompetent Evidence—Rules of Railroad Co.— The only errors relied on for reversal are (1) the admission of incompetent evidence; (2) the exclusion of competent evidence. On the trial, appellants offered to introduce certain rules of the company regulating the running of trains. Held, that the care employes of railroad companies must exercise in the operation of their cars, so far as the general public are concerned, is to be determined by the principles of law, and not by the rules adopted by the railroad company for the guidance of its employes.

3. Witnesses—Impeachment—Evidence Considered.—An impeached witness at one stage of the proceedings or another should always be given an opportunity to explain the supposed contradictory statement. A great many witnesses were introduced at the trial on both sides. Where testimony is considered in the light of the fact that the carload of dynamite was placed at a point where the public in large numbers were in the habit of passing to and fro, and where there is some evidence tending to show that it was a common shooting ground; that the car was not properly placarded, and that no person was placed in charge of it to give warning of the fact that it contained dynamite, we conclude that the alleged slight error of the trial court was not prejudicial to the substantial rights of appellant.

HUMPHREY & HUMPHREY, W. A. HENDERSON, J. M. ALCORN, WILLIAM LOW and H. H. TYE for appellants.

H. C. FAULKNER, A. T. SILER and J. N. SHARP for appellee.

OPINION OF THE COURT BY WM. ROGERS CLAY, COMMISSIONER—Affirming.

On September 21st, 1906, a house belonging to appellee, Bond Stewart, was damaged by an explosion of a car of dynamite. At the time of the explosion the car was in the railroad yard at Jellico, and this yard was in the joint control of the appellants, Southern Railway Company and Louisville & Nashville Railroad Company. Charging that his property was damaged by the negligence of appellants, appellee brought this action to recover damages. The jury returned a verdict in appellee's favor for $1,660. From the judgment based thereon, this appeal is prosecuted.

The car in question contained 450 cases of dynamite and nitro-glycerine. It was placed in the yard about 8 o'clock in the evening and remained there until about 7:47 the next morning, when it exploded. By the ex-

plosion many persons were killed and a great deal of property destroyed or damaged. No person knew that the car contained explosives except the depot agent and Conductor Yerkes of the train that brought the car in. The car was not guarded, nor was there any warning given to the public that it contained explosives. The proof shows that there was no contents card on the east side of the car. Whether there was such a card on the other side or at the two ends, the evidence is conflicting. Jellico is a town of 3,500 inhabitants. The explosion took place at a point about 150 or 200 yards from the main portion of the town. Many persons lived and performed labor around the place where the car was located. There was evidence to the effect that within about twenty feet of where the car stood there was a common shooting ground where persons shot at marks and turkeys for general amusement, and that this fact was known to appellants, and had been for years. On the trial it was appellee's contention that the explosion was caused by the shunting of other cars against the car loaded with dynamite. Appellants undertook to disprove this theory of appellee by showing that none of the engines which could have shunted the car were in a position to do so at the time of the accident. They also undertook to show that the explosion was caused by a man by the name of Walter Rodgers shooting into the car with a 22-calibre rifle.

The only two errors relied upon for reversal are: First, the admission of incompetent evidence; second, the exclusion of competent evidence.

On cross-examination, Conductor Yerkes, who was in charge of the train which brought the car of dynamite to Jellico, was asked in regard to certain rules of the Southern Railway Company adopted by it for the purpose of governing the conduct of its employes in handling dynamite cars. These rules were read to the jury, over the objection of appellants. It may be conceded that the admission of this evidence was improper, for this court is committed to the doctrine that the care employes of companies must exercise in the operation of cars, so far as the general public is concerned, is to be determined by the principles of law, and not by the rules adopted by the company for the guidance of its employes. (Louisville Railway Co. v. Gaugh, 133 Ky., 467.) The court also permitted the rules of the Keystone Powder Manufacturing Company, which manufactured

the dynamite in question, to be read as evidence. This evidence, while not material one way or the other, should not have been admitted for the same reason.

The witness, Stanfill, who was in charge of Southern Railway engine No. 686, testified on the trial that it was his duty to take the engines to the cinder pit for the purpose of cleaning out the fire boxes, and that on the occasion in question he had taken engine No. 686 to the cinder pit and was on the engine when the explosion occurred. On cross-examination he was asked whether or not, on a trip from Indian Territory to St. Louis he had not told Dr. John Siler that he had shoved the cars back and caused the explosion. He denied making this statement. Dr. Siler was then introduced by appellee in rebuttal. Siler testified that Stanfill told him that, at the time of the accident, he was a hostler in charge of the engines in the yard in Jellico and that he kicked the car or cars against the one that exploded, and the force of the explosion knocked him down. Thereafter appellants sought to introduce Stanfill for the purpose of having the latter tell the exact conversation with Dr. Siler and explain the circumstances under which it took place. The court declined to permit this evidence to go to the jury. The jury was excluded and the answers of Stanfill to the questions were allowed by agreement to be made in the nature of an avowal. Stanfill avowed that he and Dr. Siler sat together on the train from Indian Territory to St. Louis and had quite a talk; that while they were together—a period of about four hours—Dr. Siler consumed a quart of whisky; that in the course of their conversation the question of the Jellico explosion was brought up, and Dr. Siler asked him what caused it: that witness stated some people thought the explosion was caused by Walter Rodgers shooting into the car, while others thought it was caused by a car or cars being shunted into the dynamite car; that he told Dr. Siler that as he was the hostler in charge of Southern Railway engine No. 686 he was accused by some people of causing the explosion.

The leading case upon the question of impeaching a witness by showing that he has made statements contradictory to those made upon the trial is the Queen's Case, 2 Brod. & Bing. 313, 314. The unanimous opinion of the judges was delivered by Abbott, C. J., and in the course of his opinion, he said:

"The legitimate object of the proposed proof is to discredit the witness. Now, the usual practice of the courts below, and a practice to which we are not aware of any exception, is this: If it be intended to bring the credit of a witness into question by proof of anything that he may have said or declared, touching the case, the witness is first asked, upon cross-examination, whether or not he has said or declared that which is intended to be proved. If the witness admits the words or declarations imputed to him, the proof on the other side becomes unnecessary; and the witness has an opportunity of giving such reason, explanation, or exculpation of his conduct, if any there may be, as the particular circumstances of the transaction may happen to furnish, and thus the whole matter is brought before the court at once, which, in our opinion, is the most convenient course. If the witness denies the words or declarations imputed to him, the adverse party has an opportunity afterwards of contending that the matter of the speech or declaration is such, that he is not to be bound by the answers of the witness, but may contradict and falsify it; and, if it be found to be such, his proof in contradiction will be received at the proper season. If the witness declines to give any answer to the question proposed to him, by reason of the tendency thereof to criminate himself, and the court is of the opinion that he can not be compelled to answer, the adverse party has, in this instance, also, his subsequent opportunity of tendering his proof of the matter, which is received, if by law it ought to be received. But the possibility that the witness may decline to answer the question affords no sufficient reason for not giving him the opportunity of answering, and of offering such explanatory or exculpatory matter as I have before alluded to; and it is, in our opinion, of great importance that this opportunity should be thus afforded, not only for the purpose already mentioned, but because, if not given in the first instance, it may be wholly lost; for a witness, who has been examined, and has no reason to suppose that his further attendance is requisite, often departs the court, and may not be found or brought back until the trial be at an end. So that, if evidence of this sort could be adduced on the sudden and by surprise, without any previous intimation to the witness or to the party producing him, great injustice might be done; and, in our opinion, not unfrequently, would be done both to the witness and

the party; and this is not only in the case of a witness called by a plaintiff or prosecutor, but equally so in the case of a witness called by a defendant; and one of the great objects of the course of proceeding, established in our courts, is the prevention of surprise, as far as practicable, upon any person who may appear therein.''

The purpose of asking the witness, whose testimony is sought to be impeached, as to the time, place and person involved in the supposed contradiction is two fold: First, to give him an opportunity to correct the statement already made on the witness stand; second, to give him an opportunity, on re-examination, to explain the nature, circumstances, meaning and design of what he is proved elsewhere to have said. (Greenleaf on Evidence, 15th Edition, section 462.) But, inasmuch as the impeached witness may not be introduced at all, we are inclined to the opinion that the re-examination should not be limited to the time the witness is on the stand, but that he may be recalled for the purpose of explaining his alleged contradictory statement. This view is sustained by the early case of State v. Winkley, 14 N. H., 480, where the court said:

''The facts stated in this case render it necessary to inquire how far a witness whose testimony has been impeached by evidence that he has made contradictory statements in relation to the same transaction. may be permitted, on his re-examination, to give his statement of the conversations in which the contradictions of his present testimony are said to have been made. Holmes, a witness for the State, testified to a certain transaction. The prisoner then introduced three witnesses. Foss, Locke and Avery, whose testimony tended to prove that Holmes had given accounts of that transaction inconsistent with the truth of his testimony. All these witnesses related conversations between themselves and Holmes. Holmes was then recalled by the attorney-general, and was asked what he said to Foss, Locke, and to Avery, on the several occasions to which their testimony referred. This was objected to, but was permitted by the court to be put, the court ruling that Holmes might state all the conversations he had with these witnesses, at the times to which they referred. To this ruling the prisoner excepts. Holmes was recalled because his testimony had been impeached. Three witnesses had testified that in certain conversations he had made certain statements. Upon these points, therefore,

he was entitled to be heard, either by way of express denial that he had made the statements, or by explaining or qualifying them. Their effect upon his credibility might have been destroyed by evidence that they were made in an ironical manner and tone, by showing that they were connected with other remarks in such a way that they ought not to impair his credit, or that he could not have been supposed to be serious in making them."

Again:

"The inquiry, in relation to each of the three witnesses, was limited to the particular conversations to which they alluded, and the only point we intend to decide is, that when the credit of the witness has been impeached by proof that in a certain conversation he has made statements inconsistent with the truth of his testimony, he may on his re-examination state what that conversation was. We are not aware that any direct authorities are to be found on this matter, and we are led to this conclusion by a regard for what, as it seems to us, the interests of truth and justice require. This view of the case, as it appears to us to be a sound one, avoids the objection which exists in proving that the witness has made statements at other times similar to his testimony, and thus fortifying his testimony by his declarations made out of court."

The same rule is recognized in the case of Hedge v. Clapp, 22 Conn., 262, where the court said:

"In the present case, at any rate, we see no cause for the plaintiff's complaint. His witness was still within his reach, and subject to his control, after the impeaching testimony had been heard; and all the cases agree in determining, that, in such case, the witness could have been recalled by the plaintiff, for the purpose of explanation."

As the impeached witness may, as it is pointed out in the Queen's case, supra, leave the scene of the trial, and cannot then be introduced, we conclude that it is always proper to permit him, on re-examination, while on the stand, to explain the supposed contradictory statement. On the other hand, as the impeaching witness may not be introduced at all, and there may be, therefore, no necessity for explanation, we conclude that the impeached witness may be recalled and then given an opportunity to explain. In other words, the impeached witness at one stage of the proceedings or another should al-

ways be given an opportunity to explain the supposed contradictory statement.

But the question still remains whether the action of the court, in admitting the rules of the Southern Railway Company and of the Keystone Powder Manufacturing Company, and excluding the explanatory statements of the witness, Stanfill, was prejudicial to the substantial rights of appellants.

The trial in this case consumed about two weeks. The transcript of testimony consists of 1,852 typewritten pages. Appellee introduced thirty-four witnesses in chief, to prove what caused the explosion and how it affected and damaged his property, and one witness in rebuttal. Appellants introduced eighty-six witnesses in chief, to show how the explosion was caused, and six witnesses in rebuttal. Eight of appellee's witnesses, who were in a position to see, testified that they saw the loose cars run down the track and strike the car loaded with dynamite, when the explosion occurred. Nine other witnesses for appellee testified that they saw the cars switching and going towards the point where the explosion took place. Four other witnesses for appellee testified that they were close enough to, and did, hear the striking of the cars together, and immediately after heard the explosion. Thus the witness, Stanfill, was impeached, not merely by evidence of contradictory statements, but by evidence tending to show the falsity of his testimony. When the testimony referred to above is considered in the light of the fact that the carload of dynamite was placed at a point where the public in large numbers were in the habit of passing to and fro, and where there is some evidence tending to show that it was a common shooting ground, and that the car was not properly placarded, and that no person was placed in charge of the car to give the public warning of the fact that it contained dynamite, we conclude that the alleged errors of the trial court respecting the matters above referred to were not prejudicial to the substantial rights of appellant. Indeed, it would be difficult to conduct a trial lasting so long and embracing such a large number of witnesses without making some slight errors in the admission or exclusion of evidence.

Judgment affirmed.